

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-07-255-CV

CITY OF ARGYLE, TEXAS                                          APPELLANT

V.

DAVID PIERCE, AN INDIVIDUAL, AND                              APPELLEES
CLEAR CHANNEL OUTDOOR, INC.

------------

FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

------------

## OPINION

------------

### I.  Introduction

This is the case of "Where's the sign?"  In four issues, Appellant City of Argyle ("the City") appeals the denial of its plea to the jurisdiction and asserts that (1) David Pierce ("Pierce") and Clear Channel Outdoor, Inc. ("Clear Channel") (collectively, "the Signers") have no standing to bring constitutional property claims because they have no vested property rights; (2) if Pierce and

Clear Channel had standing, their inverse condemnation claim is invalid and would not defeat sovereign immunity; (3) a civil court lacks jurisdiction over claims in equity that challenge a penal ordinance; and (4) the City cannot be estopped from enforcing its sign ordinance. Because we hold that the City has successfully challenged the trial court's jurisdiction over some, but not all, of the Signers' claims, we reverse and render in part and affirm in part.

## II. Factual and Procedural Background

Pierce and Clear Channel erected an off-premises outdoor advertising sign and sued the City when the City attempted to enforce its sign ordinance preventing such signs from being erected in the City's extra-territorial jurisdiction ("ETJ") against Pierce and Clear Channel.

### A. Ordinance Prohibits Signs in the ETJ

On August 24, 1993, the City adopted a "Sign Regulations" ordinance ("the Ordinance"), known as "Article 12.400." The Ordinance, as amended in 1997, regulated and applied to signs within the City's limits and within its ETJ. The Ordinance contained detailed descriptions of the City's sign regulations, including a requirement to obtain a permit from the City and a list of prohibited signs. The Ordinance expressly prohibited "[s]igns advertising off-premise businesses, products or services" like the one that is the genesis of this suit and included a $500 penalty clause.

2

In 2003, the City adopted a very similar ordinance that raised the fine to a maximum of $2,000 and continued to prohibit off-premises signs within the City and its ETJ. As reflected in the city council meeting minutes for June 10, 1997, the City approved an ETJ Apportionment Agreement between the City and two nearby municipalities, the City of Northlake and Corral City, and that agreement has been on public file in the Denton County property records since July 21, 1997. The ETJ agreement describes a dotted line that forms the southern and eastern boundaries of the City's ETJ.

**B. McCutchin Property**

On January 26, 1999, the City annexed approximately 144 acres of land owned by the Ronald McCutchin Family Partnership, LTD., and Gene Paul McCutchin into its ETJ ("McCutchin Property"). The McCutchin Property mostly surrounded the property at issue in this case. The City annexed the McCutchin Property by adopting Ordinance 99-01.

The City requested that David Gattis, the City's cartographer, draw a map concerning the City's boundaries and ETJ. The map in part designated the City's ETJ by labeling such property "Extraterritorial Jurisdiction." The map did not, however, designate the sign property as "Extraterritorial Jurisdiction." Labeled "Abstracts," the Gattis map was displayed in the City offices.

3

### C. Pierce

In 2000, prior to executing a Lease with Clear Channel, Pierce sought to have his property rezoned. According to Pierce, the City Secretary, Debbie Milligan, responded that whether he could accomplish rezoning was not an issue for the City but for Denton County because the sign property was not located within the City's ETJ and that he could therefore do whatever he wanted to do with the property. To support this statement, Milligan referred Pierce to the Gattis map that designated the sign property as not within the City's ETJ. Before the sign was constructed, Pierce did not tell Clear Channel about his conversation with Milligan, his interpretation of the Gattis map, or other information regarding whether the sign location was within the City's ETJ. No one from Clear Channel ever asked Pierce whether the sign location on the Pierce property was in the City's ETJ.

### D. Clear Channel, TxDOT, and the City

Prior to entering into the lease with Pierce, and prior to applying for a permit, Clear Channel looked into whether the sign property was located within the City's ETJ. Clear Channel began working with Texas Department of Transportation ("TxDOT") in March 2002 to determine the location of the property and whether an outdoor advertising sign could be erected on the property. Clear Channel was seeking to obtain a rural-road sign permit. The property was located on a rural road, and Texas law required Clear Channel to

4

obtain a permit from TxDOT to operate its sign unless the property was located in the ETJ of a municipality.

According to Judy Jamison, Clear Channel's Assistant Real Estate Manager,[1] whenever Clear Channel applied to TxDOT for a sign permit, it included maps of the location of the sign so that TxDOT knew where to go to inspect the sign location. One map that Clear Channel submitted to TxDOT showed the sign in question as a "Centermount monopole," with the center pole of the sign twenty-seven feet south of the southern edge of F.M. 407 and about .8 miles east of Interstate Highway 35.

Jamison went to the City's offices in late 2001 or early 2002 to find out if the sign property was in the City's ETJ. The City referred Jamison to the Gattis map, hanging on the wall of the City's permit clerk's office, which did not show the property to be in the City's ETJ. The Gattis map indicated that the sign property was separate from the City, located in an "island" surrounded by the City. According to Jamison, the city secretary, Codi Delcambre, told her that the property had possibly been disannexed by the City some time ago because the City and the former owner of the property "had a falling out." The

---

[1] Jamison was Clear Channel's only Assistant Real Estate Manager for the Dallas Division, and no other employee in that division performed her job functions. Jamison's job functions included determining whether a potential sign location would be in conformance with state and local regulations. According to Jamison, it was her responsibility to determine whether a sign location was in a municipality's ETJ.

5

sign location was south of and adjacent to F.M. 407 (a two-lane rural road) in Denton County and was adjacent to the City's corporate boundary running along the north edge of that road. In other words, the sign was across the street from the City's incorporated limits, and it was less than fifty feet from the City's corporate boundary. Jamison's visit to the City provided the information that Clear Channel relied on to conclude that the sign location was not in the City's ETJ.

Jamison also went to City Hall on September 23, 2003, after the City discovered that the sign had been built and had promptly "red tagged" the sign before construction could be finalized. During the second visit to the City, Jamison was accompanied by another Clear Channel employee, Teresa Moore. Jamison and Moore spoke with Bill Palmer, the City's Code Enforcement Officer, who asserted that the sign was in the City's ETJ. That same day, Jamison and Moore spoke with Delcambre, who also asserted that the property was in the City's ETJ. Clear Channel investigated the Denton County Appraisal Records with regard to the property; the records indicated that the property was not taxed by the City.

Before Clear Channel built the sign, it was aware that off-premises signs were prohibited within the City's ETJ. Jamison had reviewed the City's sign ordinance before the sign was built, and it was clear to her that the ordinance prohibited the type of sign at issue within the City's ETJ. Because of that fact,

6

Clear Channel specifically intended to find a potential sign location in an area outside the City's ETJ. A year and two months before initiating the permitting process for the sign in question, Arnold Velez (President of the Dallas Division of Clear Channel) received written notification from TxDOT stating that the City did not allow certain signs in its ETJ. Velez stated that it was likely that he would have forwarded that letter to the Clear Channel real estate department.

**E. The Lease**

Clear Channel routinely solicited lease agreements to place outdoor advertising signs on private property, and it solicited and obtained such a lease from Pierce. On March 29, 2002, Pierce and Clear Channel executed a lease allowing Clear Channel to erect an outdoor advertising sign on Pierce's property, which is located in an unincorporated region of Denton County. The lease contained a provision that allowed Clear Channel to terminate the agreement if it was "unable to obtain or maintain any necessary permit for the erection, use and/or maintenance" of a sign or if its sign's use was "prevented or restricted by law." Clear Channel obtained the permit from TxDOT to own and operate a sign on the property, as previously recounted. But after Clear Channel began constructing the sign, the City stopped Clear Channel, asserting that the property was in its ETJ and, therefore, was prohibited by the Ordinance.

**F. Procedural History**

On November 24, 2003, the City's municipal court issued complaints against Pierce and Velez for erecting an illegal off-premises sign. The following day, summonses were issued commanding Pierce and Velez to appear in municipal court on December 15, 2003, and answer the complaints.

The Signers—Pierce and Clear Channel—filed this lawsuit in state court, seeking a declaratory judgment with regard to the property's location and was that the property in question had been subject to inverse condemnation, that the plaintiffs had been deprived of their property interests, and that the penalties accessed by the City were tolled during the Signers' constitutional challenges. On the City's motion, the case was removed to federal court. The federal court subsequently denied the City's motion for summary judgment, specifically ruling that the location of the property relative to the City's ETJ was a question under Texas law, and remanded the majority of the case to state court.[2]

On May 25, 2007, the City filed its plea to the jurisdiction to challenge the subject matter jurisdiction of the trial court, alleging,

---

[2] Currently, the case is splintered between the federal court and the state trial court where it was originally filed; the federal court maintained jurisdiction over some of the constitutional causes of action filed by the Signers.

8

Plaintiffs are challenging a penal ordinance and are not in danger of any constitutional deprivations to vested property rights. Plaintiffs' pleading affirmatively negates their inverse condemnation claim. Argyle's sign ordinance is not arbitrary or capricious. Enforcement of the sign ordinance is a governmental function and Argyle is not subject to being estopped from enforcing the sign ordinance. Therefore, Argyle is immune from suit, this Court is without jurisdiction in this matter and Plaintiffs' suit should be dismissed.

On June 29, 2007, the trial court denied the City's plea to the jurisdiction without specifying the reason therefor. This appeal followed.

### III. Standard of Review — Plea to the Jurisdiction

We review the denial of a plea to the jurisdiction under a de novo standard. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). A plea to the jurisdiction is a dilatory plea; its purpose is "to defeat a cause of action without regard to whether the claims asserted have merit." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). The purpose of a dilatory plea is not to force the plaintiffs to preview their case on the merits but to establish a reason why the merits of the plaintiffs' claims should never be reached. *Id.* Although the claims may form the context in which a plea to the jurisdiction is raised, the plea should be decided without delving into the merits of the case. *Id.*

Accordingly, in determining whether jurisdiction exists, we construe the pleadings liberally in favor of the plaintiffs and look to the pleaders' intent. *See Miranda*, 133 S.W.3d at 226. We may also consider evidence presented to the

9

trial court relevant to jurisdiction when it is necessary to resolve the jurisdictional dispute. *See Bland*, 34 S.W.3d at 554–55. If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend. *County of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002).

## IV. Declaratory Judgment

In their live petition at the time of the trial court's ruling on the City's plea to the jurisdiction, the Signers first asserted a cause of action under the Declaratory Judgments Act. The Act provides,

> A person interested under a . . . written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance . . . may have determined any question of construction or validity arising under the . . . ordinance . . . and obtain a declaration of rights, status, or other legal relations thereunder.

TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(a) (Vernon Supp. 2007). Specifically, the Signers sought a declaratory judgment that (1) the sign property is not within the City's ETJ; (2) the City is estopped from asserting that the sign property is within its ETJ; (3) the City's authority to regulate in its ETJ has been revoked; and (4) the City has disannexed the sign property.[3] The

---

[3] The Signers also sought a declaratory judgment that Velez is not subject to the Ordinance, but the City's plea to the jurisdiction did not challenge the trial court's jurisdiction over that cause of action.

10

City's third and fourth issues challenge the trial court's jurisdiction over these declaratory judgment claims.

A. **The Trial Court's Jurisdiction Over a Case Involving a Penal Ordinance**

In its third issue, citing *State v. Morales*, 869 S.W.2d 941, 945 (Tex. 1994), the City argues that the trial court may not hear these declaratory judgment claims because the Ordinance is a penal ordinance, over which a civil court has no jurisdiction.[4] The Texas Supreme Court in *State v. Morales* held that, with exceptions, a civil court does not have jurisdiction to render a declaratory judgment regarding the constitutionality of a penal statute. *Id.* at 947. The court explained,

> In this state's bifurcated system of civil and criminal jurisdiction, a civil court has jurisdiction to declare constitutionally invalid and enjoin the enforcement of a criminal statute only when (1) there is evidence that the statute at issue is unconstitutionally applied by a rule, policy, or other noncriminal means subject to a civil court's equity powers and irreparable injury to property or personal rights is threatened, or (2) the enforcement of an unconstitutional statute threatens irreparable injury to property rights. A naked declaration as to the constitutionality of a criminal statute alone, without a valid request for injunctive relief, is clearly not within the jurisdiction of a Texas court sitting in equity.

*Id.* at 942. The City argues that the Signers cannot challenge the Ordinance in a civil suit because they cannot meet the *Morales* exceptions and because they

---

[4] The City asserts that its Ordinance is a penal statute because its violation constitutes a misdemeanor offense that carries a fine of up to $2,000.

11

have an adequate remedy at law: challenging the penal provision as part of their defense to a criminal prosecution.  Because this argument mischaracterizes the Signers' requested declaratory relief, we disagree.

The Signers do not challenge the constitutionality or the enforceability of the Ordinance; rather, their lawsuit seeks a declaration that their conduct *did not constitute a violation of* that Ordinance.  This request necessarily assumes the validity of the Ordinance because it asks the court to apply the Ordinance's provisions to the facts of this case and to conclude that the Ordinance does not proscribe the Signers' erection of their sign.  Accordingly, we hold that *State v. Morales* does not affect the trial court's jurisdiction in this case, and we overrule the City's third issue.[5]

### B.      The Trial Court's Jurisdiction Over the Signers' Allegedly Meritless Claim of Estoppel

Next, the City argues in its fourth issue that it is not estopped from enforcing the Ordinance because estoppel cannot be invoked against a

---

[5] We note that courts have allowed the Declaratory Judgments Act to be used to address conflicts over construction of municipal ordinances and boundary disputes.  *See, e.g.*, *Super Wash, Inc. v. City of White Settlement*, 131 S.W.3d 249, 256 (Tex. App.—Fort Worth 2004) (holding that appellant could seek declaration of the validity of a municipal ordinance under the Declaratory Judgments Act because appellant's rights, status or other legal relations were affected by the ordinance), *rev'd on other grounds,* 198 S.W.3d 770 (Tex. 2006); *Bexar Metro. Water Dist. v. City of Bulverde*, 156 S.W.3d 79, 88–89 (Tex. App.—Austin 2004, pet. denied) (holding that appellees had the right to have the courts interpret a water district's enabling act to determine issues relating to the water district's boundaries).

12

municipality that is engaged in its governmental or public functions. Citing *Bexar Metropolitan Water District v. Education & Economic Development Joint Venture*, 220 S.W.3d 25, 32 (Tex. App.—San Antonio 2006, pet. filed), the City asserts that if equitable estoppel does not apply in a case against a governmental unit, there is no waiver of immunity from suit.

In *Bexar Metropolitan Water District*, a joint venture sued Bexar Met for specific performance of a contract to sell real estate after Bexar Met had refused to close. *Id.* at 27. The joint venture argued that principles of justice, honesty, and fair dealing should estop Bexar Met from asserting its immunity from suit. *Id.* at 32. The court held that, because the joint venture had failed to show that application of equitable estoppel would not interfere with the exercise of Bexar Met's governmental functions and that Bexar Met had accepted and retained the benefits arising from the contract, Bexar Met was not estopped from asserting its immunity, and it reversed the trial court's denial of Bexar Met's plea to the jurisdiction. *Id.* (citing *City of Hutchins v. Prasifka,* 450 S.W.2d 829, 836 (Tex. 1970) (discussing lack of interference with governmental functions); *City of Corpus Christi v. Gregg,* 155 Tex. 537, 543, 289 S.W.2d 746, 751 (1956) (discussing accepted and retained benefits)).

In contrast, here, the City is not arguing that its plea to the jurisdiction should have been granted because estoppel does not apply to its assertion of governmental immunity. Rather, the City is attempting to argue that the trial

13

court lacks jurisdiction because estoppel cannot be invoked to bar its assertion that the sign property is within its ETJ. In essence, the City is arguing that the trial court does not have jurisdiction because the Signers' cause of action is without merit. However, the City has not shown that this is a proper manner in which to challenge the trial court's jurisdiction.

In our review of a trial court's ruling on a plea to the jurisdiction, we do not delve into the merits of a case or decide whether the plaintiff would lose on its claims; rather, we merely decide whether the trial court has the power to reach the merits of those claims. *Bland Indep. Sch. Dist.*, 34 S.W.3d at 554. Even if the law ultimately would not permit the City to be estoped from asserting that the sign property is within its ETJ, the City has cited no authority for the proposition that the ultimate outcome on the Signers' declaratory judgment claims has any bearing on the existence of the trial court's jurisdiction to hear the declaratory judgment causes of action. Accordingly, we overrule the City's fourth issue.

## V. Inverse Condemnation

In the alternative to their declaratory judgment causes of action, the Signers pleaded a claim for inverse condemnation under Article I, Section 17 of

the Texas constitution.[6]  As the Signers explain, in the event that the trial court ruled that the sign property is in the City's ETJ and that the Ordinance is constitutional, then they would assert this alternative cause of action.  In its second issue, the City argues that the trial court erred by denying its plea to the jurisdiction as to the Signers' inverse condemnation claim because the Signers cannot show that the City's sovereign immunity has been waived.

## A.    Waiver of Immunity for Inverse Condemnation Claims

Governmental immunity affords a city protection from suit when the city engages in the exercise of governmental functions unless that immunity is clearly waived. *City of Dallas v. Jennings*, 142 S.W.3d 310, 315 (Tex. 2004); *Harris County v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004).  Article I, section 17 of the Texas constitution waives governmental immunity for valid inverse condemnation claims.  *See Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001).  Inverse condemnation occurs when property

---

[6] The Signers also pleaded a cause of action for deprivation of property under the Fifth and Fourteenth Amendments to the United States Constitution. The City contends that this claim is merely a restatement of, and is therefore subsumed by, the inverse condemnation claim.  The Signers do not disagree, and in fact, do not even discuss this deprivation-of-property cause of action in their brief; they discuss only the inverse condemnation claim, stating that it is "contingent upon the outcome of its declaratory judgment requests and constitutional challenges to the Sign Ordinance, the latter of which is pending before the Federal Court."  Therefore, we shall assume that the Signers' alternative inverse condemnation claim includes their deprivation-of-property claim as well.

15

is "taken" for public use without proper condemnation proceedings and the property owner attempts to recover compensation for that taking. *City of Abilene v. Burk Royalty Co.*, 470 S.W.2d 643, 646 (Tex. 1971). To state a cause of action for inverse condemnation under the Texas constitution, a plaintiff must allege (1) an intentional governmental act, (2) that resulted in his property being taken, damaged, or destroyed, (3) for public use. *Little-Tex*, 39 S.W.3d at 598.

Takings are classified as either physical or regulatory. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998), *cert. denied*, 526 U.S. 1144 (1999). The Signers do not argue that the City has physically taken their property; instead, they allege a regulatory taking. A compensable regulatory taking occurs when a governmental agency imposes restrictions that either deny a property owner all economically viable use of his property or unreasonably interfere with the owner's right to use and enjoy the property. *Id.* at 935; *Taub v. City of Deer Park*, 882 S.W.2d 824, 826 (Tex. 1994), *cert. denied*, 513 U.S. 1112 (1995). Whether particular facts are sufficient to allege a constitutional taking is a question of law. *Little-Tex*, 39 S.W.3d at 598. When a plaintiff does not allege a valid inverse condemnation claim, governmental immunity applies, and the trial court should grant a plea to the jurisdiction. *Bell v. City of Dallas*, 146 S.W.3d 819, 825 (Tex. App.—Dallas 2004, no pet.).

16

**B.      The Property Interests Alleged To Have Been "Taken"**

The Signers assert four property interests that the City has "taken": Pierce's fee interest in the land and Clear Channel's leasehold, sign, and TxDOT sign permit.

### 1.      *TxDOT sign permit*

First, we observe that the TxDOT permit is not a property interest because the Texas Administrative Code unequivocally states: "[I]ssuance of a permit shall not be deemed to create a property right in the permittee."  43 TEX. ADMIN. CODE § 21.581 (2002).  The Signers, citing *Graham v. Richardson*, 403 U.S. 365, 374, 91 S. Ct. 1848, 1853 (1971), and *Reed v. Village of Shorewood*, 704 F.2d 943 (7th Cir. 1983), contest this statute by asserting that "a State's characterization of a governmental benefit is not determinative of the constitutional rights of the benefit holder."  However, they present no argument nor cite any authority that the permit is a property interest contrary to the clear wording of the statute.  We hold that the TxDOT permit is not a property interest compensable as a result of inverse condemnation.

### 2.      *The sign*

The Signers argue that the sign on the sign property is a fixture, so it gives rise to a property right for which compensation is owedwhen taken. But whether a billboard is a fixture is a question of fact to be determined from the mode and sufficiency of annexation, either real or constructive; from the

adaptation of the article to the use or purpose of the realty; and from the intent of the party who annexed the chattel to the realty. *See Logan v. Mullis*, 686 S.W.2d 605, 607 (Tex. 1985); *see also Stevenson v. Clausel*, 437 S.W.2d 404, 407 (Tex. Civ. App.—Houston [14th Dist.] 1969, no writ) ("Of the tests for determining whether or not a chattel has become a fixture, pre-eminence is given to the intention to make the thing a permanent accession to the freehold; the other tests are of value chiefly as evidence of this intention.").

In our review of the trial court's ruling on the City's plea to the jurisdiction, we construe the pleadings liberally in favor of the plaintiffs and look to the pleaders' intent. *See Miranda*, 133 S.W.3d at 226. We take as true all evidence favorable to the Signers and indulge every reasonable inference and resolve any doubts in their favor. *See id.* at 228. But in their petition, the Signers merely provide the conclusory assertion that "[t]he City's actions . . . constitute an inverse condemnation through the taking, damaging, or destroying of Pierce and Clear Channel's property for public use without just compensation." They do not further allege any facts explaining why the sign in this case is "property" that the City has inversely condemned through a

18

"taking."  Furthermore, on appeal, the Signers merely assert generally that "the Sign is a fixture," without providing any evidence of its permanent nature.[7]

While we are to construe the pleadings and evidence liberally in favor of the Signers, we cannot create evidence where none has been presented, and we cannot assume that the billboard is a fixture in the absence of any evidence showing so.  Therefore, we hold that the sign is not a property interest compensable as a result of inverse condemnation.

3.  *The fee simple and leasehold interests*

Finally, the Signers claim that the City has "taken" Pierce's fee interest and Clear Channel's leasehold interest[8] in the sign property because the City has denied them the economically viable use of their property interests and has unreasonably interfered with their right to enjoy and use their property interests.

---

[7] *Compare Stevenson*, 437 S.W.2d at 406–08*.*  The *Stevenson* court held that the evidence was sufficient to support the jury's finding that a billboard was a fixture when evidence was presented that the billboard

> extended to a very considerable distance into the air and was 90 feet in length.  It was supported by nine vertical wide flange metal columns, each of which were set in concrete to a depth of approximately eight feet.  The billboard appears to have been a most substantial structure very firmly attached to the premises.

*Id.* at 406.

[8] An ownership interest in a leasehold is the legal right to possess that property for a set period of time.  *Travis Cent. Appraisal Dist. v. Signature Flight Support Corp.*, 140 S.W.3d 833, 841 (Tex. App.—Austin 2004, no pet.).

19

However, there is no constitutional property right to use realty in any certain way without restriction. *City of La Marke v. Braskey,* 216 S.W.3d 861, 863 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). In *Braskey*, the court noted that

> use of [the appellee's] property as a facility for cats is not a constitutionally protected vested right because it concerns only the way that her property is used, which is not an absolute right [and that the] asserted harms—the closing of her facility, the death of cats housed at the facility, possible fines levied against her for operating the facility, her possible confinement for operating the facility, and her expenditure of attorney's fees to pursue continued operation of the facility—all concern the use of her property as a facility for cats, which is not a constitutionally protected vested right.

*Id*. at 864; *see also* in *Sterling v. San Antonio Police Dep't*, 94 S.W.3d 790, 794–95 (Tex. App.—San Antonio 2002, no pet.) ("Sterling has no constitutionally protected property right to lease gambling devices."); *Hang On III v. Gregg County*, 893 S.W.2d 724, 727 (Tex. App.—Texarkana 1995, writ dism'd by agr.) ("[A] property owner does not acquire a constitutionally protected right in a property use merely because it began as a conforming use and is later rendered nonconforming."); *Smith v. Copeland*, 787 S.W.2d 420, 422 (Tex. App.—San Antonio 1990, no writ) (holding when considering an injunction preventing the operation of massage parlors within 1,500 feet of residents, that "property owners do not acquire a constitutionally protected vested right in property uses once commenced or in zoning classification once

made); *Sparten Indus., Inc. v. State*, 379 S.W.2d 931, 932 (Tex. Civ. App.—Eastland 1964, no writ) (holding when considering enforcement of the Sunday "blue law," that "it is evident [that] appellant had no vested property rights entitling them to an injunction against enforcement of the statute).

Overall, it must be remembered that, whatever value and usage the property may be put to, the singular use and benefit being foreclosed is that of an outdoor sign advertising off-premises material. Therefore, the entirety of Pierce's ability to use the property he owns, and of Clear Channel's ability to use the property it leases, is not wholly curtailed; they may use the property for myriad purposes, but not for the one specific purpose of erecting the billboard at issue in this case. Accordingly, the Signers have not alleged facts sufficient to allege a constitutional taking of property, so they have also not alleged a valid inverse condemnation claim. *See Little-Tex*, 39 S.W.3d at 598.

Citing *Harris County v. Progressive National Bank*, 93 S.W.3d 381, 383 (Tex. App.—Houston [14th Dist.] 2002, pet. denied), the Signers argue that the City's challenge to the trial court's jurisdiction is an improper attempt to litigate the merits of their inverse condemnation claim. In *Harris County*, the court held that Harris County's plea to the jurisdiction improperly rested upon unresolved factual contentions that went directly to the merits of the bank's suit. *Id.* at 383–84. However, the court went on to examine the allegations in the bank's petition, taking them as true and construing them in the light most favorable to

21

the pleader, and held that the petition stated a claim for a constitutional taking because it alleged that (1) Harris County intentionally sold an automobile on which the bank held a lien without fulfilling its duty to notify the bank, (2) that the sale resulted in a taking of the bank's property, and (3) that such taking was for public use. *Id.* at 384.

Here, we have examined the allegations in the Signers' petition, as well as the evidence presented to the trial court, but we reach the opposite conclusion. The Signers have not stated a valid claim for a constitutional taking because (1) the TxDOT permit and the billboard are not property interests subject to compensation and (2) the sign ordinance does not deny them all economically viable use of their property or unreasonably interfere with their right to use and enjoy the property; therefore, no regulatory taking is alleged. Accordingly, because the Signers have not stated a valid inverse condemnation claim, governmental immunity applies, and the trial court should have granted the City's plea to the jurisdiction on the inverse condemnation claim. *See Bell*, 146 S.W.3d at 825. We sustain the City's second issue.[9]

---

[9] Having sustained the City's second issue, we need not address its first issue, in which it claims that the Signers have no standing to sue for inverse condemnation. *See* TEX. R. APP. P. 47.1.

22

## VI. Conclusion

Having sustained the City's second issue and concluded that governmental immunity applies to the Signers' inverse condemnation claim, we reverse that part of the trial court's order denying the City's plea to the jurisdiction with regard to the inverse condemnation and deprivation of property claims and render judgment dismissing those claims. *See* TEX. R. APP. P. 43.2(c). However, having overruled the City's third and fourth issues challenging the trial court's jurisdiction over the Signers' declaratory judgment causes of action, we affirm that part of the trial court's order denying the City's plea to the jurisdiction with regard to the Signers' declaratory judgment claims. *See* TEX. R. APP. P. 43.2(a).

BOB MCCOY
JUSTICE

PANEL A:   CAYCE, C.J.; LIVINGSTON and MCCOY, JJ.

DELIVERED: May 15, 2008